# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADOLPHUS MARCH, | CASE NO. 10cv0082 JM(BGS) |
| Plaintiff, | ORDER GRANTING MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| ABM SECURITY SERVICES, f.k.a. AMERICAN COMMERCIAL SECURITY SERVICES, INC.; and ABM INDUSTRIES, INC., | |
| Defendants. | |

Defendant ABM Security Services, Inc. ("ABM") moves for summary judgment on each claim alleged in the First Amended Complaint ("FAC"). Plaintiff Adolphus March opposes the motion. For the reasons set forth below, the court grants the motion for summary judgment on all claims in favor of ABM and against Plaintiff. The Clerk of Court is instructed to close the file.

## BACKGROUND

Two days after filing the original complaint, Plaintiff filed the FAC on July 30, 2009, alleging three claims for employment discrimination: wrongful termination in violation of Title VII of the Civil Rights Act of 1964, retaliation in violation of Title VII, and violation of Section 12940 of Cal. Government Code. On January 7, 2010, this action was transferred to this court from the Southern District of Texas, Houston Division.

### Plaintiff's Employment with ABM

Plaintiff March is a 50-year-old African-American male who commenced his employment with ABM on December 4, 2001 as a private security officer. (FAR ¶7; March 45:7-8). Plaintiff worked

1  as a security officer for ABM at the Harbor Club in San Diego, California, until his termination on
2  October 24, 2006.  Throughout his five years of employment, Plaintiff reported to Michael
3  Cockerham, an African-American man employed by ABM as the site supervisor at the Harbor Club.
4  (Cockerham Decl. ¶2-3, 7).

<u>Plaintiff's Employment Related Complaints</u>

6  On June 27, 2006 Plaintiff called ABM's harassment hotline to complain about an issue
7  relating to a vacation request. The complaint did not allege any form of harassment or discrimination
8  concerning race. Rather, Plaintiff complained about a denied vacation request. (March 59:11-23).

9  At some unspecified period of time, Plaintiff also testified that he heard another security
10 officer, Neil Thomas, say that "the only good Mexican he ever saw was a dead Mexican" (March
11 81:1-25). No one else heard the comment nor did March report the comment to his supervisor,
12 Michael Cockerham. Plaintiff testified that this was the only time he heard Neil Thomas make any
13 racially offensive comment. (March 85:1-86:11).

14 During his five years of employment with ABM, Plaintiff states that he heard two derogatory
15 comments about African-Americans. On the first occasion, another African-American security
16 officer, Joel Nelson, told Plaintiff that he heard another security officer use the word s "house nigger"
17 in reference to Cockerham. (March 101:5-13). Plaintiff advised Joel Nelson to inform Cockerham
18 of the reference but does not know if Nelson ever did so. Plaintiff does not remember in what year
19 he heard the statement from Nelson.  Plaintiff never informed Cockerham of this racial slur.

20 The only other occasion occurred in August 2006 when another security officer, Paul Delgado,
21 told Plaintiff that he heard Gerald Steed refer to Plaintiff as a "whiny black ass nigger." (March
22 108:20-23). Plaintiff testified that he never heard Steed use the N word in his presence nor did he talk
23 to him about the use of the racial slur.[1] Plaintiff did, however, report to Cockerham that Steed "had
24 a nasty attitude and that he had been using racial slurs." Plaintiff did not tell Cockerham the specific
25 comment, when the comment occurred, or the content of the alleged comment. (March 121:5-10).

26 Cockerham testified that Plaintiff told him that Steed was talking behind his back. (Cockerham
27 Decl. ¶6). Plaintiff did not say anything about using the N word. If he had, Cockerham would have
28

---

[1] On a several occasions, Plaintiff heard Steed use the words "beaner" and "gooks."

- 2 -                                                                 10cv0082

1  terminated Steed. (Cockerham Decl. ¶7). When Cockerham spoke with Steed about the incident (i.e.
2  talking behind Plaintiff's back), he thought it was a "simple personality conflict." (Cockerham Decl.
3  ¶8). After Cockerham spoke to Steed, Plaintiff never reported any further instances of any racial
4  comments or other problems with Steed or anyone else. Plaintiff testified that throughout his
5  employment with ABM, he never personally heard anyone use the N word. (March 115:5-8).
6      Besides these incidents, Plaintiff never heard any racially offensive comments.
7      <u>Plaintiff's Termination</u>
8      During his employment with ABM, Plaintiff had several conflicts with Neil Thomas. They
9  often had disagreements when Thomas was the swing shift supervisor and Plaintiff the graveyard shift
10 supervisor. Before September 2006, Thomas became the assistant shift supervisor. (Cockerham Decl.
11 ¶10). On September 2, 2006 Thomas and Plaintiff engaged in a heated exchange concerning a
12 personnel decision made by Thomas concerning a trainee employee. (Cockerham Decl. ¶10). Plaintiff
13 explains that the two individuals had different employee disciplinary approaches and that Thomas
14 would "stick his nose" in Plaintiff's business. (March 64:23-65:7). Thomas reported the incident to
15 Cockerham.
16     Because of the tension between Plaintiff and Thomas, on September 8, 2006, Cockerham
17 discussed the matter with Plaintiff and directed him to report to ABM's branch office for more formal
18 counseling. (Cockerham Decl. ¶¶10-11; March 129:3-9). Plaintiff told Cockerham that he would go
19 as soon as possible. (March 129:3-6). March did not go to ABM's office, located a couple miles from
20 the Harbor Club. (March 129:18-19).
21     On September 29, 2006, the operations manager for ABM, Esvin Lopez, told Plaintiff that he
22 needed to come to the office for counseling related to the altercation he had with Thomas on
23 September 2, 2006. (Lopez Decl. ¶7). Lopez informed Plaintiff that he could "be subject to further
24 action if he did not report as directed. Mr. March then stated that he wanted to be paid to come into
25 the office. . . . Mr. March did not say anything about any alleged racial slurs or inappropriate
26 comments at the Harbor Club. He did not say anything about Mr. Steed, or about any complaints he
27 had made about alleged racial slurs." (Lopez Decl. ¶7).
28     On October 3, 2006 Lopez again spoke with Plaintiff and directed him to report to the branch
   office for counseling. (Lopez Decl. ¶8). Plaintiff told Lopez that he was busy and would come in if

he were to get paid as soon as possible. (March 131:22-25). Plaintiff was off shift and told Lopez that it was not cheap to go downtown and that he wanted to be paid. (March 131:1-8). Lopez told him he would not be paid. Id. (Lopez Decl. ¶13).

By late October 2006, March still had not reported to the office for counseling On or about October 20, 2006, Lopez reported to the branch manager, Nick Orlik, that Plaintiff had not come into the office for counseling. On October 20, 2006, Orlik left a message for Plaintiff telling him to come into the office for a meeting. Orlik also directed that Plaintiff be taken of the Harbor Club work schedule until he came in for the meeting. (Orlik Decl. ¶7).

On October 23, 2006 Plaintiff went to the branch office where he met with Lopez, Cockerham and Orlik. Plaintiff acknowledged that he had refused to follow his supervisors' instructions on the work site because he disagreed with them. He also stated that he had been too busy to come into the office earlier, that he had two deaths in the family, and that he wanted to be paid for the time spent coming to the office. At no time did Plaintiff mention anything about racial harassment or discrimination. (Lopez Decl. ¶¶10, 13; Orlik Decl. ¶¶10, 11). When Plaintiff was asked whether he would assure management that there would be no further instances of insubordination in the future, Plaintiff declined. (Orlik ¶11).

After the October 23, 2006 meeting, Orlik decided to terminate Plaintiff's employment because he failed, over the course of two months, to come into the office and because of Plaintiff's conflict with the assistant site supervisor. (Orlik Decl. ¶13). On October 24, 2006, Orlik spoke with Plaintiff and terminated his employment. At no time was Orlik aware of Plaintiff's complaint about the use of racial slurs by Steed. (Orlik Decl. ¶16; Cockerham Decl. ¶¶8, 16).

On or about October 24, 2006, Plaintiff called ABM's hotline and complained that he was being terminated because of problems he had with Lopez and Thomas. (March 160:25-162:12). At no time did Plaintiff complain of any racial discrimination or harassment. Id.

Defendant now moves for summary judgment on all claims alleged in the FAC. Plaintiff opposes the motion.

## DISCUSSION

**Legal Standards**

A motion for summary judgment shall be granted where "there is no genuine issue as to any

- 4 -

1  material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P.
2  56(c); Prison Legal News v. Lehman, 397 F.3d 692, 698 (9th Cir. 2005). The moving party bears the
3  initial burden of informing the court of the basis for its motion and identifying those portions of the
4  file which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v.
5  Catrett, 477 U.S. 317, 323 (1986). There is "no express or implied requirement in Rule 56 that the
6  moving party support its motion with affidavits or other similar materials negating the opponent's
7  claim." Id. (emphasis in original). The opposing party cannot rest on the mere allegations or denials
8  of a pleading, but must "go beyond the pleadings and by [the party's] own affidavits, or by the
9  'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that
10 there is a genuine issue for trial.'" Id. at 324 (citation omitted). The opposing party also may not rely
11 solely on conclusory allegations unsupported by factual data. Taylor v. List, 880 F.2d 1040, 1045 (9th
12 Cir. 1989).

13       The court must examine the evidence in the light most favorable to the non-moving party.
14 United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Any doubt as to the existence of any issue
15 of material fact requires denial of the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255
16 (1986). On a motion for summary judgment, when "'the moving party bears the burden of proof at
17 trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence
18 were uncontroverted at trial.'" Houghton v. South, 965 F.2d 1532, 1536 (9th Cir. 1992) (emphasis
19 in original) (quoting International Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264-65 (5th Cir.
20 1991), cert. denied, 502 U.S. 1059 (1992)).

21 **The Motion for Summary Judgment**

22     <u>Title VII Discrimination</u>

23       The parties do not dispute that the McDonnell Douglas burden shifting approach applies to
24 Plaintiff's Title VII discrimination claim.

25       Under that framework, the burden of production first falls on the plaintiff to
make out a prima facie case of discrimination. He may do so by showing that (1) he
26 belongs to a protected class, (2) he was qualified for the position he held (or for the
position to which he wished to be promoted), (3) he was terminated or demoted from
27 (or denied a promotion to) that position, and (4) the job went to someone outside the
protected class. The burden of production then shifts to the employer, who must
28 present evidence sufficient to permit the factfinder to conclude that the employer had
a legitimate, nondiscriminatory reason for the adverse employment action. Finally, if
the employer meets that burden, then the McDonnell Douglas framework drops out of

the picture entirely, and the plaintiff bears the full burden of persuading the factfinder that the employer intentionally discriminated against him. Id. at 507-08, 113 S.Ct. 2742. (citations omitted)

Coghlan v. Am. Seafoods Co., 413 F.3d 1090, 1094 (9th Cir. 2005); Wallis v. J.R. Simplot Co., 26 F.3d 885, 890-91 (9th Cir. 1994). It is at the point in the McDonnell Douglas analysis where the burden shifts to the employee to rebut ABM's showing of legitimate nondiscriminatory reasons for his discharge that Plaintiff's cause falters.

ABM argues that Plaintiff cannot provide any evidence that he was competently performing his job and, alternatively, that ABM had legitimate, nondiscriminatory reasons for Plaintiff's discharge. In light of the repeated instructions by ABM management (the site supervisor, the operations manager, and the branch manager) that Plaintiff report to ABM's office for counseling regarding the altercation with the assistant site supervisor, Plaintiff does not submit any evidence that he was competently performing his job duties. Rather, Plaintiff argues that he was not required to report for counseling because operations manager Lopez told him that he would not be paid for the time spent on counseling at ABM's office. While Plaintiff may have a wage-and-hour claim, he cites no authority excusing an employee from complying with his job responsibilities and duties under the circumstances.[2] At the time of the meeting with Orlik, the undisputed evidence shows that Plaintiff acknowledged his insubordination in refusing to report for counseling. Plaintiff also refused to provide any assurance that he would refrain from such conduct in the future.

Plaintiff does come forward with evidence to show that he consistently received positive job performance reviews and consistent raises in pay. (Plaintiff's Exhs. 1-4). However, this evidence fails to address the central issues that led to his discharge: the insubordination and nearly two-month failure to report for counseling. The court concludes that Plaintiff fails to satisfy his burden of coming forward with specific evidence to raise a genuine issue of material fact on whether he was competently performing his employment position. Nilsson v. City of Mesa, 503 F.3d 947, 954 (9th Cir. 2007).

---

[2] The court could not locate in the record whether or not Plaintiff was compensated for the time spent in the October 23, 2006 meeting with Orlik. At the time of oral argument, ABM conceded that Plaintiff was correct in his understanding that he was required to be compensated for his counseling session. ABM's failure to reassure Plaintiff that he would be compensated is, on this record, nothing more than a failure to properly interpret the mandate to provide such compensation. It does not constitute evidence of discrimination and certainly does not transform Plaintiff's insubordination into an employment discrimination case.

Even if Plaintiff were to establish a prima facie case of discrimination, the court concludes that ABM has met its burden of demonstrating legitimate, non-discriminatory reasons for Plaintiff's discharge and that Plaintiff fails to identify any evidence that the proffered reasons are pretextual. The undisputed evidence shows that Plaintiff was involved in a workplace incident with assistant site supervisor Thomas concerning a personnel decision regarding a trainee. The altercation did not involve any allegation of racial discrimination or harassment. (March 75:13-77:11). The site supervisor as well as the operations manager instructed Plaintiff on several occasions to report to the branch office for counseling. Plaintiff repeatedly failed to follow directions. (March 136:14-137-8; Cockerham Decl. ¶11, 12; Lopez Decl. ¶¶6-9; Orlik Decl. ¶6-8). Plaintiff appeared only when he was taken off the Harbor Club work schedule. At the meeting, the only topic discussed was Plaintiff's insubordination and the prolonged failure (nearly two months) to report to the branch office for counseling. At that meeting, Plaintiff did not discuss any allegations of racial discrimination or harassment. (March 150:23-151:22). Furthermore, Plaintiff acknowledged his insubordination and refused to assure his supervisors that it would not happen again. (Orlik Decl ¶11).

The decision-making process involved in discharging Plaintiff also demonstrates the absence of any intentional discrimination. Orlik declares that he was the sole decision maker in deciding to terminate Plaintiff. (Orlik ¶¶13, 14). Orlik was not aware that any racially offensive comments had been made about Plaintiff.[3] Orlik discharged Plaintiff because of Plaintiff's "repeated failure to follow multiple instructions by his superiors to come into the office for counseling. . . [and he] considered the information available regarding Mr. March's conflict with the assistant site supervisor. On those bases, I decided to terminate Mr. March's employment with ABM for insubordination." (Orlik Decl. ¶13). Furthermore, after his discharge on October 24, 2006, Plaintiff called ABM's harassment hotline and complained that he was being terminated because of problems he had with Lopez and Thomas. (March 160:25-162:12). Significantly, Plaintiff did not complain about any racial discrimination or harassment on the job site. Id.

---

[3] Plaintiff testified that he never heard Steed use the N word in his presence nor did he talk to Cockerham about the use of the racial slur. Plaintiff did, however, report to Cockerham that Steed "had a nasty attitude and that he had been using racial slurs." Plaintiff did not tell Cockerham the specific comment, when the comment occurred, or the content of the alleged comment. (March 121:5-10).

Based upon the factual record presented by ABM, the burden shifts to Plaintiff to show by substantial and specific evidence that his discharge for insubordination was pretextual for intentional discrimination. Plaintiff does not offer any direct evidence that ABM discriminated against him because of his race. Plaintiff's claim of pretext is instead based entirely on circumstantial evidence, which "must be specific and substantial" for Plaintiff's claim to survive summary judgment. See Bergene v. Salt River Project Agric. Improvement & Power Dist., 272 F.3d 1136, 1142 (9th Cir. 2001). The only argument raised by Plaintiff is that the proffered reasons for his termination are "inherently unworthy of credence because of the illegality implicit therein. There is no doubt that ABM intended for March to know that this session would be uncompensated." (Oppo at p.9:16-18). Plaintiff cites no authority for the proposition that a potential wage-and-hour claim constitutes evidence of intentional discrimination or excuses Plaintiff from coming forward with any evidence of intentional discrimination. As Plaintiff fails to create a genuine issue of material fact under the burden-shifting framework of McDonnell Douglas, ABM is entitled to summary judgment on this claim.

In sum, the court concludes that Plaintiff fails to meet his burden to demonstrate that he was adequately performing his job responsibilities or that the proffered non-discriminatory reasons identified by ABM are pretextual. ABM's motion for summary judgment on this claim is granted.

Title VII Retaliation

To establish a prima facie case of retaliation under Title VII, Plaintiff must show that (1) he engaged in a protected activity," (2) defendants took an adverse employment action against him, and (3) a causal link exists between his protected activity and the adverse employment action. Vasquez v. County of Los Angeles, 349 F.3d 634. 646 (9th Cir. 2003).

ABM moves for summary judgment on grounds that Plaintiff cannot demonstrate the requisite causal link between any protected activity and his discharge, and even if there were, ABM had legitimate nondiscriminatory reasons to discharge Plaintiff. Plaintiff argues that he was terminated in retaliation for lodging two complaints, one with the 1-800 number in June and the other in August. (Oppo. at p.12:16-18). The court concludes that the June 2006, complaint cannot form the basis for a retaliation claim. On June 27, 2006, Plaintiff called ABM's harassment hotline to complain about an issue relating to a vacation request. The complaint did not allege any form of harassment or

1  discrimination concerning race. Rather, Plaintiff complained about a denied vacation request. (March
2  59:11-23). On the present record, there is insufficient evidence to show a causal link between
3  Plaintiff's complaint regarding vacation time and his termination.

4  Plaintiff's second complaint concerns the conversation with his supervisor, Cockerham, in
5  August 2006 wherein he reported to Cockerham that Steed "had a nasty attitude and that he had been
6  using racial slurs." Plaintiff did not tell Cockerham the specific comment, when the comment
7  occurred, or the content of the alleged comment. (March 121:5-10). Plaintiff testified that he never
8  heard Steed use the N word in his presence nor did he talk to him about the use of the racial slur.[4]

9  Cockerham testified that Plaintiff told him that Steed was talking behind his back. (Cockerham
10 Decl. ¶6). Plaintiff did not say anything about using the N word. If he had, Cockerham would have
11 terminated Steed. (Cockerham Decl. ¶7). When Cockerham spoke with Steed about the incident (i.e.
12 talking behind Plaintiff's back), he thought it was a "simple personality conflict." (Cockerham Decl.
13 ¶8). After Cockerham spoke to Steed, Plaintiff never reported any further instances of any racial
14 comments or other problems with Steed or anyone else nor did Cockerham report the incident to his
15 supervisors. (Cockerham ¶8). Plaintiff testified that throughout his employment with ABM, he never
16 personally heard anyone use the N word. (March 115:5-8).

17 The court concludes that the evidence submitted by Plaintiff fails to establish the requisite
18 causal link between his reports that Steed used racial slurs and his termination. The record shows that
19 neither Cockerham nor Orlik had been informed that Steed had made racially charged allegations nor
20 did Plaintiff report any discriminatory conduct to ABM's harassment hotline.

21 Furthermore, as in the case of Title VII discrimination, the court also finds, for the above-
22 stated reasons, that ABM had legitimate, nondiscriminatory reasons to discharge Plaintiff. As Plaintiff
23 fails to submit any evidence that the proffered reasons are pretextual, the court grants the motion for
24 summary judgment on the Title VII retaliation claim.

25 In sum, the court grants summary judgment on the Title VII retaliation claim in favor of ABM
26 and against Plaintiff.

27 The Harassment and Hostile Work Environment Claim

28

---

[4] Plaintiff testified that he did her Steed use the words "gooks" and "beaner" on several occasions. He never reported these racial slurs to his supervisors.

1          To prevail on a harassment claim under Title VII, a plaintiff must prove: (1) unwelcome
2 conduct; (2) because of a protected category; (3) that severely or pervasively "permeated" the
3 employee's work environment so as to alter the terms or conditions of employment. Oncale v.
4 Sundowner Offshore Services, Inc., 523 U.S. 75, 80-81 (1998). In evaluating a claim for hostile work
5 environment, courts look to the totality of circumstances, including (1) the frequency of the
6 discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a
7 mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work
8 performance. Harris v. Forklift Sys., 510 U.S. 17, 23 (1993). A plaintiff must show that the work
9 environment is both subjectively and objectively hostile. Nichols v. Azteca Rest, Enterp., 256 F.3d
10 864, 871-72 (9th Cir. 2001). ABM moves for summary judgment on grounds that Plaintiff cannot
11 show severe or pervasive harassment in the workplace.

12         The evidentiary records reveals that over a five-year period of time, Plaintiff heard a co-
13 employee use the words "beaner" and "gook" on several different occasions. He also heard, at some
14 unidentified point in time, Thomas state on one occasion that "the only good Mexican he ever saw was
15 a dead Mexican." This was the only time he ever heard Thomas make a racially offensive comment.
16 (March 85:1-4; 86:1-11). He also heard through a third party that Steed used the N word on two
17 occasions. Plaintiff does not recall when the first use of the N word occurred. The second use of the
18 N word occurred in about August 2006. Delgado told Plaintiff that he heard Steed refer to Plaintiff
19 as a "whiny black ass nigger." (March 108:20-23; 112:2-18). Plaintiff never heard Steed's comment
20 first hand nor did Plaintiff ever hear anyone use the N word while employed at the Harbor Club.
21 Further, Plaintiff did not report the use of the offensive comments to his supervisor, Cockerham. If
22 he had, Cockerham would have discharged the employee. (Cockerham Decl. ¶8). Similarly, Plaintiff
23 never reported any incident of racial discrimination or harassment to ABM's hotline.

24         The evidentiary record reveals that the complained-of conduct did not permeate the workplace
25 nor was it sufficiently severe and pervasive to alter the conditions of employment. While the use of
26 racial slurs in the workplace cannot be condoned, the complained-of conduct, consisting exclusively
27 of the use of racial slurs, occurred infrequently, were not physically threatening and, moreover,
28 Plaintiff fails to identify any manner in which the racial slurs interfered with his workplace

performance.[5] The authorities cited by Plaintiff do not support his hostile work environment claim. In <u>Woods v. Graphic Communications</u>, 925 F.2d 1195 (9th Cir. 1991), the court determined that "racial jokes, cartoons, comments and other forms of hostility directed at almost every conceivable racial and ethnic group, particularly Blacks, were common at the plant." <u>Id.</u> at 1197-98. Woods, the plaintiff, was directly subjected to "racial remarks and hostility, such as a karate chop by a [union employee], a racial joke by [another union steward], and instructions to wash his hands in a urinal." <u>Id.</u> at 1198. Woods also had his work area defaced with the letters "KKK." Woods also filed grievances regarding the plant's racial atmosphere and the defendant union did not pursue the grievances on Woods' behalf.

In <u>McGinest v. GTE Service Corp.</u>, 360 F.3d 1103 (9th Cir. 2004), the plaintiff was called "stupid nigger" to his face, white workers received overtime pay but he did not, white employees would, for example, obtain new tires to replace worn out tires on their vehicles while his request was denied and he was forced to use the worn tires until he suffered a vehicle accident, he was subject to racist comments such as "I'll retire before I work for a black man," he was told only drug dealers can afford nice gold chains (like plaintiff's), employees were referred to as "mammy" and "Aunt Jemima" in front of plaintiff, and racist graffiti was written on the walls. The graffiti included the word "nigger" and PONTIAC, meaning "poor old nigger thinks it's a Cadillac," and "nigger go home." During Black History Month a coworker scratched out the word "Black" and replaced it with "Nigger." The poster was left on the wall for three weeks. Plaintiff reported the racist graffiti to

---

[5] The court rejects Plaintiff's argument that the EEOC reasonable cause determination is sufficient to create a genuine issue of material fact. An EEOC letter of determination is simply a preliminary determination. Where the independent and fully developed record before the court fails to establish a genuine issue of material fact, like here, "a favorable EEOC letter determination does not create one." <u>Simms v. Ok. ex rel Dep't of Mental Health</u>, 165 F.3d 1321 (10th Cir. 1999). The court also rejects Plaintiff's argument that ABM failed to adequately investigate and take corrective action on his claim of racial discrimination. There is only one incident in the record where Plaintiff complained of racial slurs. Plaintiff reported to his supervisor, Cockerham, that Steed "had a nasty attitude and that he had been using racial slurs." Plaintiff did not tell Cockerham the specific comment, when the comment occurred or the content of the content. (March 121:5-10). Cockerham testified that Plaintiff did not say anything about Steed using the N word and, if he had, Cockerham, an African-American, would have terminated Steed. Rather, plaintiff told Cockerham that Steed was talking behind his back. From his conversation with Plaintiff, Cockerham believed that it was a "simple personality conflict." (Cockerham Decl. ¶8). Cockerham then spoke with Steed about the incident. After this conversation Plaintiff never reported any further instances of any racially based comments from Steed or anyone else. Throughout his employment with ABM, Plaintiff never personally heard anyone use the N word. (March 115:5-8).

1 management.

2     Here, the complained-of conduct does not come close to approaching the severity, frequency, or intensity of the complained-of conduct in <u>Woods</u> or <u>McGinest</u>. Accordingly, the court concludes that Plaintiff fails to raise a genuine issue of material fact with respect to his harassment and hostile work environment claims.

    In sum, the court grants summary judgment in favor of ABM, and against Plaintiff, on all claims alleged in the FAC. The Clerk of Court is instructed to close the file.

**IT IS SO ORDERED.**

DATED: June 10, 2011

_____
Hon. Jeffrey T. Miller
United States District Judge

cc:    All parties